UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 10-17001-EPK

Chapter 13

IN RE:                                              :
                                                    :
Ronik Seecharan and                                 :
Maribel Seecharan,                                  :
                                                    :
                        Debtors.                    :
_____                     :

## MOTION BY AMS SERVICING, LLC FOR RELIEF FROM STAY OR IN THE ALTERNATIVE, MOTION TO DISMISS AND REQUEST FOR EXPEDITED HEARING RE: 11094 Stonewood Forest Trail, Boynton Beach, Florida 33473

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, AMS SERVICING, LLC, by and through its undersigned attorneys, for its Motion for Relief from the Automatic Stay, Or In The Alternative, Motion to Dismiss, herein states and alleges as follows:

1.      That Debtor filed a Chapter 13 petition in bankruptcy in the United States Bankruptcy Court for the Southern District of Florida on March 19, 2010.

2.      This is a motion pursuant to Bankruptcy Rule 4001(a) for a relief of the automatic stay provisions of Section 362(d)(1) of the Bankruptcy Code or, in the alternative, a motion to dismiss the bankruptcy petition.

3.      That AMS SERVICING, LLC, is a secured creditor by virtue of a promissory note and mortgage on real property. Said real property has the following legal description: Lot 125, CANYON ISLES – PLAT TWO, according to the Plat thereof, as recorded in Plat Book 105, at Page 40, of the Public Records of Palm Beach

County, Florida a/k/a 11094 Stonewood Forest Trail, Boynton Beach, Florida  33437.

The note and mortgage are attached hereto as Exhibit "A".

4.    That the aforementioned documents give the secured creditor, AMS

SERVICING, LLC, a first mortgage position on the property known as: 11094

Stonewood Forest Trail, Boynton Beach, Florida  33437.

5.    That Debtors are indebted to the secured creditor in the amount of

$1,209,473.11 as set forth in AMS SERVICING, LLC's Proof of Claim, filed on June 15,

2010, which is attached to this motion as Exhibit "B".

6.    The Palm Beach County Property Appraiser shows a just market value of

the property at $605,051.00.  A copy of the appraisal is attached hereto and made a part

hereof as Exhibit "C".

7.    That the Debtors failed to adequately protect the interest of the secured

creditor.

8.    That there is no equity in the property.

9.    Movant has incurred attorney's fees in the amount of $ 550.00 as a result

of the necessity of filing this Motion.  Said attorney's fees and costs may be recoverable

pursuant to state law and the mortgage documents.

10.    That AMS SERVICING, LLC, is prohibited from instituting and/or

completing a foreclosure action in the State Court because of the pendency of this

Bankruptcy motion, and that in the absence of the court's Order allowing the secured

creditor, AMS SERVICING, LLC, to proceed with the Foreclosure action, the secured

creditor's security will be significantly jeopardized.

11.    A copy of the proposed Orders are attached as Exhibit "D".

2

12.     Alternatively, AMS SERVICING, LLC seeks dismissal of Debtors' bankruptcy petition.  In Schedule D of the bankruptcy petition, Debtors claim $910,000.00 in unsecured debt.  That amount exceeds jurisdictional limits, pursuant to 11 U.S.C. § 109(e) and mandates that this Court dismiss this case.  See *In Re Larry Groh and Shulamit Hanover*, attached as Exhibit "E".

13.     In addition, Debtors claim $1,692,827.00 in secured debt which also exceeds the jurisdictional limits pursuant to 11 U.S.C. § 109(e) and mandates this Court dismiss this case.  However, Debtors have attempted to circumvent the secured jurisdictional limit by claiming the $910,000.00 of the first mortgage as unsecured debt.  Said claim is incorrect.

14.     Also, to inform this Court further, the plan is not funded properly. The Debtors cannot make adequate payments under the plan short of being allowed to cram down the first, secured mortgage.

Therefore, AMS SERVICING, LLC alternatively moves for the dismissal of Debtors' bankruptcy petition.

15.     AMS SERVICING, LLC requests the Court set an expedited hearing due to exigent circumstances as follows:

    a.     Just prior to the foreclosure sale, Debtors convinced AMS SERVICING, LLC to halt the sale of the property by agreeing to make payments and forwarded a check to AMS SERVICING, LLC.   However, the check was returned for insufficient funds and AMS SERVICING, LLC was forced to reset the sale date.

    b.     Just prior to the second sale date, the Debtors filed bankruptcy.

c.　　On March 19, 2010, the Debtors filed a "bare bones" bankruptcy petition for relief under Chapter 13 of the Bankruptcy Code.  The Court issued a Notice of Deficiency on March 19, 2010 noting that the following documents were not filed by the Debtors: Schedules A through J, Statement of Financial Affairs, Declaration Concerning Debtors' Schedules, Statement of Current Monthly Income and Disposable Income Calculation and Payment Advices for Debtors.

d.　　A Motion to Extend Time to File Schedules/Plan/Required Info was filed on April 1, 2010 (Docket #14) and the Court issued an Order Granting the Motion to Extend Time to File Schedules/Plan/Required Info (Docket #15), allowed Debtors until April 15, 2010 to comply.  Debtors filed an Ex Parte Motion to Extend Time to File Schedules, Plan, Schedules and Plan, Required Info  (Docket #18).  The Court issued an Order granting motion (Docket #20) which allowed Debtors until April 21, 2010 to comply.  Debtors failed to comply with the Court's order and the Court issued an Order Dismissing Case with 180 Days Prejudice For Failure to File Complete Chapter 13 Schedules, for Failure to File Chapter 13 Plan for Failure to File Statement of Current Monthly Income, for Failure to File Payment Advices (Docket #21).

e.　　Debtors filed a Motion to Vacate Dismissal and Reinstate Chapter 13 Case on April 30, 2010 (Docket #23). The Court issued an Order Granting Motion to Vacate and Reinstate Case on May 24, 2010 (Docket #28).

f.　　On May 21, 2010, the Debtors filed a Chapter 13 Plan (Docket #27).  Creditor filed an Objection to the Chapter 13 Plan Filed by Debtors on June

16, 2010 (Docket #39).  The plan filed by the Debtors did not include a provision for full satisfaction of Creditor's arrearages, the plan misrepresented the valuation of the Creditor's collateral, the plan reduced the interest rate to 5.5% from 7.95% as originally agreed to by the Debtors in the Note and Mortgage and the plan did not provide for the delinquent property taxes for the years 2007 and 2009.

Pursuant to 11 U.S.C. § 1325(a)(3), the plan was not proposed in good faith.  Schedule J of the bankruptcy petition does not provide for property taxes or automobile insurance thereby presenting an unrealistic view of monthly expenses and the Debtors ability to properly fund the plan.

g.    The unsecured debt listed by Debtors in Schedule D of the bankruptcy petition exceeds the unsecured debt limit as provided for in 11 U.S.C. § 109(e).

h.    The plan improperly lists the property at 11094 Stonewood Forest Trail, Boynton Beach, Florida  33437 as investment property which would allow the Debtors to "cram down" the mortgage rather than exempt the property which may not be "crammed down".

WHEREFORE, PREMISES CONSIDERED, AMS SERVICING, LLC prays for relief from the automatic stay; or in the alternative, for dismissal of Debtors' bankruptcy petition, and for all other just and equitable relief.  AMS SERVICING, LLC requests that the 14-day stay period imposed by F.R.B.P. 4001(a)(3) be waived or reduced.

## CERTIFICATE PURSUANT TO LOCAL RULE 9011-4(B)(1)

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

## CERTIFICATE PURSUANT TO LOCAL RULE 9073-1(D)

I further certify that I have conferred with opposing counsel in an attempt to resolve these issues without a hearing.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion By AMS Servicing,LLC For Relief From Stay Or In The Alternative, Motion to Dismiss and Request for Expedited Hearing Re: 11094 Stonewood Forest Trail, Boynton Beach, Florida 33473, proposed Order Granting AMS Servicing, LLC's Motion For Relief From Stay, proposed Order Granting Motion to Dismiss, copy of the Proof of Claim, copy of the Appraisal, a copy of *In Re Larry Groh and Shulamit* Hanover and copies of the Note and Mortgage have been served by either CM/ECF transmission or standard first class U.S. Mail on this 2nd day of August, 2010 to the following:

Maribel Seecharan, 11094 Stonewood Forest Trail, Boynton Beach, FL  33473

Ronik Seecharan, 11094 Stonewood Forest Trail, Boynton Beach, FL  33473

Jeffrey A. Harrington, Esquire, 224 Datura Street, #510, West Palm Beach, FL  33401

Brett A. Elam, Esquire, 127 N.E. 2nd Avenue, Delray Beach, FL  33444

Maurice Hinton, Esquire, 6111 Broken Sound Parkway, N.W., #200, Boca Raton, FL 33487

Gavin N. Stewart, Esquire, 9119 Corporate Lake Drive, #300, Tampa, FL  33634

Office of the U.S. Trustee, 51 S.W. 1st Avenue, Suite 1204, Miami, FL  33130

Robin R. Weiner, P. O. Box 559007, Fort Lauderdale, FL  33355

Dated: August 2, 2010                    Respectfully submitted,


                                         By: /s/ Lawrence M. Weisberg, Esquire
                                         Lawrence M. Weisberg, Esquire
                                         Florida Bar No. 962198
                                         Counsel for AMS Servicing, LLC
                                         21301 Powerline Road, Suite 100
                                         Boca Raton, Florida   33433
                                         Telephone: (561) 362-7355
                                         Facsimile: (800) 531-8906
                                         E-mail: bankruptcy@lmwlegal.com

08/02/2010 13:10 815-550-2786 AT THE BEACH PARALEG PAGE 01/50

Case 10-17001-EPK    Doc 48    Filed 08/02/10    Page 8 of 57



R-09/14/2006



Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA 92834-34078

This document was prepared by:
BARBARA LICON

FN 20060487319
OR BK 20759 PG 0997
RECORDED 08/22/2006 10:51:23
Palm Beach County, Florida
AMT 1,000,000.00
Deed Doc 3,500.00
Intang 2,000.00
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 0997 - 1020; (24pgs)

7929



Record and return to:
PRUDANCE Title & Escrow, LLC
2500 N. Military Trail Ste. 200
Boca Raton, FL 33431

—————[Space Above This Line For Recording Data]—————

# MORTGAGE

MIN 829-2

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **August 17, 2006**
together with all Riders to this document.
(B) "Borrower" is **RONIK S SEECHARAN AND MARIBEL SEECHARAN**, husband and wife

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is **FREMONT INVESTMENT & LOAN**

**FLORIDA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**      Form 3010 1/01

-6A(FL) (0005).01
Page 1 of 16      Initials:
VMP MORTGAGE FORMS · (800)521-7291



$Exh$ "$A$"

Lender is a  **CORPORATION**
organized and existing under the laws of  **CALIFORNIA**
Lender's address is
**2727 E IMPERIAL HIGHWAY, BREA CA 92821**
(E) "Note" means the promissory note signed by Borrower and dated **August 17, 2006**
The Note states that Borrower owes Lender **One Million and No/100** -------------------
---------------------------------------------------                            Dollars
(U.S. $     **1,000,000.00**  ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **September 1, 2036**
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) **"Escrow Items"** means those items that are described in Section 3.
(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(FL) (0005).01                    Page 2 of 16          Initials:           Form 3010  1/01

R-09/14/2006

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the   County         [Type of Recording Jurisdiction]
of   **PALM BEACH**                                                 [Name of Recording Jurisdiction]:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

Parcel ID Number: **00424532030001250**                          which currently has the address of
**11094 STONEWOOD FOREST TRL**                                                        [Street]
**BOYNTON BEACH**                                          [City], Florida **33437**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(FL) (0005).01                          Page 3 of 16          Initials:           Form 3010 1/01

IR-09/14/2006

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in

-6A(FL) (0005).01                    Page 4 of 16                  Initials:_____            Form 3010  1/01

R-09/14/2006

full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

-6A(FL) (0005).01                    Page 5 of 16               Initials: [signature]          **Form 3010  1/01**

R-09/14/2006

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard

 

or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise

R-09/14/2006

agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of



OR-09/14/2006

disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.



Initials:

.6A(FL) (0005).01                        Page 9 of 16                                      Form 3010  1/01

R-09/14/2006

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

R-09/14/2006

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument

-8A(FL) (0005).01                                    Initials:                       Form 3010   1/01

R-09/14/2006

shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument,

and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental

VMP -6A(FL) (0005).01                           Page 13 of 16                                          Initials:                          Form 3010  1/01

Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.



Initials:

Form 3010   1/01

R-09/14/2006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

**THERE ARE NON-OBLIGATED SIGNER(S) WHO MUST EXECUTE THIS DOCUMENT**

_____
Lorry A. Susack

_____ (Seal)
RONIX. S SEECHARAN                -Borrower

_____
Linda K Parrish

_____ (Address)

_____ (Seal)
                                  -Borrower

_____ (Address)

_____ (Seal)
                      -Borrower

_____ (Seal)
                                  -Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
MARIBEL-SEECHARAN    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
                      -Borrower

_____ (Seal)
                                  -Borrower

_____ (Address)

_____ (Address)

JR-09/14/2006

STATE OF FLORIDA,   PALM BEACH   County ss:
The foregoing instrument was acknowledged before me this  August 17, 2006   by

Ronik S. Seecharen + Maribel Seecharen

who is personally known to me or who has produced   FDL   as identification.



Notary Public



LORRY A. CUSACK
MY COMMISSION # DD 277792
EXPIRES: April 28, 2009
Bonded Thru Notary Public Underwriters

-6A(FL) (0005).01                    Page 16 of 16                    Form 3010  1/01

# ADJUSTABLE RATE RIDER FOR
# TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE

**THIS ADJUSTABLE RATE RIDER FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE**
is made this   17th day of        **August** ,      2006 , and is incorporated into and shall
be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security
Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's
Adjustable Rate Note (the "Note") to

**FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:

**11094 STONEWOOD FOREST TRL       BOYNTON BEACH, FL 33437**

   **ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the
   Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.**  **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   Sections 3 and 4 of the Note are amended  and restated  in their entirety to read as follows:

   **3.  PAYMENTS**
   (A)  Time and Place of Payments
   I will make a payment  on the first day of every month, beginning on
   **October 1, 2006**

   Before the First Principal and Interest Payment Due Date, as described in Section 4(G) of
   this Note, on each payment due date my monthly payment will equal one-twelfth of one year's
   interest that would be due on the unpaid principal balance of this Note that I am expected to
   owe on the same day one month prior to the payment due date at the interest rate that is
   provided for in accordance with Section 2 and Section 4 of this Note.

1-09/14/2006

Beginning on the First Principal and Interest Payment Due Date, I will make monthly
payments of principal and interest. These payments will be calculated as described in Section 4
of this Note. I will make these payments every month until I have paid all of the principal,
interest and any other charges that I may owe under this Note.

Each monthly payment will be applied as of its scheduled due date, and if the payment
includes both principal and interest, it will be applied to interest before principal. If, on
**September 1, 2036**                        , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
   **2727 E IMPERIAL HIGHWAY, BREA CA 92821**

or at a different place if required by the Note Holder.

(B)  **Amount of My Initial Monthly Payments**
My initial monthly payment will be in the amount of U.S. $                    **6,625.00**
This amount will change.

(C)  **Monthly Payment Changes**
Before the First Principal and Interest Due Date, my monthly payments will change to reflect
changes in the unpaid principal balance of this Note. In addition, following the first Change
Date, my monthly payments will change to reflect changes in the interest rate that I must pay.

Beginning with the First Principal and Interest Due Date, my monthly payment will
change to include both principal and interest. In addition, my monthly payment will change to
reflect changes in the unpaid principal balance of this Note and changes in the interest rate that
I must pay.

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A)   Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of         **September, 2013**and the adjustable interest rate I will pay may change on
that day every sixth month thereafter.   The date on which my initial fixed interest rate changes
to an adjustable interest rate, and each date on which my adjustable interest rate could change,
is called a "Change Date."

### (B)   The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an
Index.   The "Index" is the six month London Interbank Offered Rate ("LIBOR"),   which is
the average of interbank offered rates for six-month U.S. dollar-denominated   deposits in the
London market, as published in *The Wall Street Journal*.  The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust
the Margin, as defined below.   The Note Holder will give me notice of this choice.

DR-09/14/2006

#### (C)  Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding  **Five and Five Hundred Fourteen Thousandths** **(5.5140**        %) (the "Margin") to the Current Index.    The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).    Subject to the limits stated in Section 4(D) of this Note, this rounded amount will be my new interest rate until the next Change Date.

For each Change Date prior to the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that is equal to one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the Change Date at my new interest rate. The result of this calculation will be the new amount of my monthly payment until the monthly payment changes again in accordance with this Note.

For each Change Date beginning with the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date, together with interest at my new interest rate, in substantially equal installments.    The result of this calculation will be my new monthly payment until the monthly payment changes again in accordance with this Note.

#### (D)  Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **10.950**    % or less than  **7.9500**    %.    Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one and one-half percentage points (1.50%) from the rate of interest I have been paying for the preceding six months.    My interest rate will never be greater than  **13.9500**    % or less than **7.9500**    %.

#### (E)  Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment due date after each Change Date until the amount of my monthly payment changes again.

#### (F)  Notice of Changes

The Note Holder will deliver or mail to me such notice of changes in my interest rate and the amount of my monthly payments as may be required by law. The notice will include information required by law to be given to me, and also the telephone number of a person who will respond to any question I may have regarding the notice.

#### (G)  First Principal and Interest Payment Due Date and First Principal and Interest Change Date

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be        **October 1, 2011** The Change Date immediately preceding the First Principal and Interest Payment Due Date is called the "First Principal and Interest Change Date."

rg  1/05/06                            p. 3 of 4

**B.**   **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended and restated in its entirety to read as
follows:

**18.**   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this
Section 18, "Interest in the Property" means any legal or beneficial interest in the
Property, including, but not limited to, those beneficial interests transferred in a bond for
deed, contract for deed, installment sales contract or escrow agreement, the intent of
which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or
transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is
sold or transferred) without Lender's prior written consent, Lender may require immediate
payment in full of all sums secured by this Security Instrument. However, this option shall
not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also
shall not exercise this option if: (a) Borrower causes to be submitted to Lender
information required by Lender to evaluate the intended transferee as if a new loan were
being made to the transferee; and (b) Lender reasonably determines that Lender's security
will not be impaired by the loan assumption and that the risk of a breach of any covenant
or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee
as a condition to Lender's consent to the loan assumption. Lender may also require the
transferee to sign an assumption agreement that is acceptable to Lender and that obligates
the transferee to keep all the promises and agreements made in the Note and in this
Security Instrument. Borrower will continue to be obligated under the Note and this
Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall
give Borrower notice of acceleration. The notice shall provide a period of not less than 30
days from the date the notice is given in accordance with Section 15 within which
Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay
these sums prior to the expiration of this period, Lender may invoke any remedies
permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Adjustable Rate Rider For Temporary Interest-Only Payment Schedule

## WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

**THERE ARE NON-OBLIGATED SIGNER(S) WHO MUST EXECUTE THIS DOCUMENT**



|                      | (Seal)     |            | (Seal)     |
|----------------------|------------|------------|------------|
| RONIK S/ SESOHARAN   | -Borrower  |            | -Borrower  |
|                      | (Seal)     |            | (Seal)     |
|                      | -Borrower  |            | -Borrower  |
|                      | (Seal)     |            | (Seal)     |
| MARIBEL SEECHARAN    | -Borrower  |            | -Borrower  |

rg 1/05/06                           p. 4 of 4

R-09/14/2006

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **17th** day of **August 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**11094 STONEWOOD FOREST TRL        BOYNTON BEACH, FL 33437**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration"). The Property is a part of a planned unit development known as **CANYON ISLES**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**MULTISTATE PUD RIDER** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3150 1/01**

Page 1 of 3                                      Initials: [handwritten]

⊛-7R (0411)            VMP Mortgage Solutions, Inc. (800)521-7291

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials:

-7R (0411) Page 2 of 3 Form 3150 1/01

)R-09/14/2006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider?

**THERE ARE NON-OBLIGATED SIGNER(S) WHO MUST EXECUTE THIS DOCUMENT**

_____ (Seal)                    _____ (Seal)
RONIK S/SEECHARAN          -Borrower                               -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                               -Borrower

_____ (Seal)                    _____ (Seal)
MARIBEL SEECHARAN          -Borrower                               -Borrower

_____ (Seal)                    _____ (Seal)
                          -Borrower                               -Borrower

**-7R (0411)                    Page 3 of 3                    Form 3150 1/01

IR-09/14/2006

# Exhibit A

Lot 125, CANYON ISLES - PLAT TWO, according to the Plat thereof, as recorded in Plat Book 105, at Page 40, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-43-27-05-059-0061

(2)

This Instrument Prepared By:
Rhonda Porter
GRP Financial Services Corp
445 Hamilton Ave. 8th Fl
White Plains, NY 10601
GRP 3350

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

Palm Beach COUNTY, FL

Date of Assignment:

Assignor:              GRP Loan, LLC

Assignee:

Executed By:           Ronik S. Seecharan
                       Maribel Seecharan

To:                    MERS Inc as Nomine for Fremont Investment & Loan

Origination Amount:    $1000000

Date of Mortgage:      8/17/2006
Recorded:
Book and Page, Doc #
Property Address:      11094 Stonewood Forest Trail, Boynton Beach, FL 33437

FOR VALUE RECEIVED, GRP Loan, LLC hereby grants, assigns and transfers to

Assignee, all beneficial interest under that certain Mortgage referred to herein together with the Note or other evidence of indebtedness (the "Note"), described or referred to the money due and to become due thereon with interest, and all rights accrued under said Mortgage and the full benefit of all the powers and of all the covenants and provisions therein contained, and the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said presents the day and year first abovewritten.

On

Witness:                                      **GRP Loan, LLC**

Print Name:                                   By:
                                              Print Name
Witness:
                                                       Kristin Tess, President
Print Name:

STATE OF NEW YORK
COUNTY OF WESTCHESTER

On DEC 1 4 2009, before me, Rhonda Porter _____ Notary Public, personally appeared
_____ Kristin Tess, President _____ of GRP Loan, LLC personally known to me (or proved to me
on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her authorized capacity, on behalf of the Corporation.

                                   Print Name:
                                   Notary Expires: _____ CC#
                                   RHONDA PORTER
                           Notary Public, State of New York
                                   No. 01PO6139984
                               Qualified in Dutchess County
                           Commission Expires January 17, 20 10

# ADJUSTABLE RATE NOTE

(6-Month LIBOR Index - Rate Caps)

(Assumable during Life of Loan) (First Business Day xxxxx Month Lxxx xxxx)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

August 17, 2006                    BREA, CA 92821
     [Date]                              [City]                                                    [State]

11094 STONEWOOD FOREST TRL         BOYNTON BEACH, FL 33437

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    1,000,000.00          (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  FREMONT INVESTMENT & LOAN

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.950          %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**★SEE ADJUSTABLE RATE NOTE RIDER ATTACHED HERETO AND MADE A PART HEREOF**

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on  October 1, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  September 1, 2036                    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  2727 E IMPERIAL HIGHWAY, BREA CA 92821

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $          6,625.00          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index (Assumable during Life of Loan) (XXXXXXXXXX Day LXXXXXXX- Single Family - Freddie Mac UNIFORM INSTRUMENT

VMP-815N (0404)          Form 5520 3/04

VMP Mortgage Solutions (800)521-7291

Page 1 of 4          Initials:

Original Note & Riders

**\*SEE ADJUSTABLE RATE NOTE RIDER ATTACHED HERETO AND MADE A PART HEREOF**
## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)    Change Dates
The interest rate I will pay may change on the first day of **September 1, 2008**      , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B)    The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C)    Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding     **Five and Five Hundred Fourteen Thousandths**      percentage points (    **5.5140**      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)    Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than **10.950**      % or less than      **7.9500**      %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than **1.5000**      from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than      **13.9500**      % or less than      **7.9500**      %.

### (E)    Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5.    BORROWER'S RIGHT TO PREPAY
### \*SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF\*
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a Prepayment. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.    LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15                calendar days after
the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  6.0                            %
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Form 5520 3/04
Initials:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*SEE ADJUSTABLE RATE NOTE RIDER ATTACHED HERETO AND MADE A PART HEREOF
*SEE PREPAYMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF*

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
RONIK/S SEECHARAN              -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                     -Borrower

_____ (Seal)        _____ (Seal)
                              -Borrower                                     -Borrower

*[Sign Original Only]*

Pay to the order of
without recourse.

Fremont Investment & Loan
Doug Pollock
Assistant Vice President

# PREPAYMENT RIDER TO NOTE

This Prepayment Rider is made this **17th**        day of    **August, 2006**         , and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note ("Note") made by the undersigned (the "Borrower") to

**FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the property located at:

**11094 STONEWOOD FOREST TRL     BOYNTON BEACH, FL 33437**

(Property Address)

## BORROWER'S RIGHT TO PREPAY

This Prepayment Rider Supersedes Section 5 of the Note

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full or partial prepayment; however, the Note Holder may charge me for the privilege of prepayment. If more than 20% of the original principal amount of this note is prepaid in any 12-month period within  **2**        years after the date of this loan, I agree to pay a prepayment charge equal to six months interest on the amount prepaid which is in excess of 20% of the original principal amount of this Note. If I make prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make full prepayment at any time.

_____    8/17/06.
RONIK S SEECHARAN          Date            _____    Date

_____    Date            _____    Date

MSPPY1 XTG 10/28/04

# RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE

THIS RIDER TO ADJUSTABLE RATE NOTE FOR TEMPORARY INTEREST-ONLY PAYMENT SCHEDULE is made this 17th        day of  August        , 2006      , and is incorporated into and shall be deemed to amend, and supplement the Adjustable Rate Note dated **August 17, 2006**                    given by the undersigned (the "Borrower") to

**FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property located at:

**11094 STONEWOOD FOREST TRL      BOYNTON BEACH, FL 33437**

(Property Address)

**A. Section 3 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:**

### 3.  PAYMENTS

**(A)    Time and Place of Payments**

I will make a payment on the first day of every month, beginning on  **October 1, 2006**        .

Before the First Principal and Interest Payment Due Date, as described in Section 4(G) of this Note, on each payment due date my monthly payment will equal one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the same day one month prior to the payment due date at the interest rate that is provided for in accordance with Section 2 and Section 4 of this Note.

Beginning on the First Principal and Interest Payment Due Date, I will make monthly payments of principal and interest. These payments will be calculated as described in Section 4 of this Note.  I will make these payments every month until I have paid all of the principal, interest and any other charges that I may owe under this Note.

Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on **September 1, 2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **2727 E IMPERIAL HIGHWAY, BREA CA 92821**

or at a different place if required by the Note Holder.

**(B)    Amount of My Initial Monthly Payments**

My initial monthly payment will be in the amount of U.S. $ **5,825.00**          . This amount will change.

**(C)    Monthly Payment Changes**

Before the First Principal and Interest Due Date, my monthly payments will change to reflect changes in the unpaid principal balance of this Note. In addition, following the first Change Date, my monthly payments will change to reflect changes in the interest rate that I must pay.

Beginning with the First Principal and Interest Due Date, my monthly payment will change to include both principal and interest. In addition, my monthly payment will change to reflect changes in the unpaid principal balance of this Note and changes in the interest rate that I must pay.

**B.**    Section 4 of the Adjustable Rate Note is amended and restated in its entirety to read as follows:

## 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)    Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of September 1, 2008    , and the adjustable interest rate I will pay may change on that day every sixth month thereafter.  The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B)    The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the six month London Interbank Offered Rate ("LIBOR"), which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal.  The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index and adjust the Margin, as defined below.  The Note Holder will give me notice of this choice.

### (C)    Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding Five and Five Hundred Fourteen Thousandths              precentage point(s) ( 5.5140         %) (the "Margin") to the Current index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) of this Note, this rounded amount will be my new interest rate until the next Change Date.


For each Change Date prior to the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that is equal to one-twelfth of one year's interest that would be due on the unpaid principal balance of this Note that I am expected to owe on the Change Date at my new interest rate.  The result of this calculation will be the new amount of my monthly payment until the monthly payment changes again in accordance with this Note.


For each Change Date beginning with the First Principal and Interest Change Date (as described in Section 4(G) of this Note), the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal balance that I am expected to owe at the Change Date in full on the Maturity Date, together with interest at my new interest rate, in substantially equal installments.  The result of this calculation will be my new monthly payment until the monthly payment changes again in accordance with this Note.

### (D)    Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 10.950  % or less than 7.9500       %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than one and one-half percentage points (1.50%) from the rate of interest I have been paying for the preceding six months.  My interest rate will never be greater than 13.9500      % or less than 7.9500            %.

### (E)    Effective Date of Changes
My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment due date after each Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me such notice of changes in my interest rate and the amount of my monthly payments as may be required by law. The notice will include information required by law to be given to me, and also the telephone number of a person who will respond to any question I may have regarding the notice.

**(G) First Principal and Interest Payment Due Date and First Principal and Interest Change Date**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") will be **October 1, 2011**    . The Change Date immediately preceding the First Principal and Interest Payment Due Date is called the "First Principal and Interest Change Date."

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Adjustable Rate Note for Temporary Interest-Only Payment Schedule.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)     _____(Seal)
RONIK S/SEECHARAN

_____(Seal)     _____(Seal)

| UNITED STATES BANKRUPTCY COURT     Southern District of Florida | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Ronik Seecharan and Maribel Seecharan | Case Number:<br>10-17001-EPK |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>AMS Servicing, LLC | ⁻⁻ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent:<br>Lawrence M. Weisberg, Esquire<br>21301 Powerline Road, Ste. 100<br>Boca Raton, FL 33433 | Court Claim Number: _____<br>*(If known)* |
| Telephone number:<br>(561) 362-7355 | Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br>AMS Servicing, LLC<br>3374 Walden Avenue, Ste,120<br>Depew, NY 14043 | Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Telephone number:<br>(716) 204-3658 | Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:      $                       1,209,473.11 | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |
|---|---|

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

✓Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

⁻⁻ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

**2. Basis for Claim:** Mortgage/Note
*(See instruction #2 on reverse side.)*

**3.** Last four digits of any number by which creditor identifies debtor: 2518

   **3a.** Debtor may have scheduled account as: _____
   *(See instruction #3a on reverse side.)*

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

   **Nature of property or right of setoff:** ✓Real Estate    ⁻ Motor Vehicle    ⁻ Other
   Describe: 11094 Stonewood Forest Tr., Boynton Beach, FL 33437

   Value of Property:$    605,051.00  Annual Interest Rate  7.950 %

   Amount of arrearage and other charges as of time case filed included in secured claim,

   if any: $   209,473.11    Basis for perfection: Recorded Mortg

   Amount of Secured Claim: $   1,209,473.11   Amount Unsecured: $_____

⁻ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

⁻ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

⁻ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

⁻ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

⁻ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date:<br>06/15/2010 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|
| | /s/ Lawrence M. Weisberg, Attorney At Law | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Exh "B"



**Gary R. Nikolits, CFA** Property Appraiser's Public Access System
**Property Appraiser** Palm Beach County

**◀ Home**

## Property Information

Location Address: **11094 STONEWOOD FOREST TRL**          **View Map**

Municipality: **UNINCORPORATED**              **Calculate Portability**

Parcel Control Number: **00-42-45-32-03-000-1250**         **Proposed Tax Notice**

Subdivision: **CANYON ISLES PL 2**

Official Records Book: **20759**   Page: **995**   Sale Date: **Jul-2006**     Reverse Side Help

Legal Description: **CANYON ISLES PL 2 LT 125**

## Owner Information

Name: **SEECHARAN RONIK S &**           **All Owners**

Mailing Address: **11094 STONEWOOD FOREST TRL**
**BOYNTON BEACH FL 33473 4884**

## Sales Information

| Sales Date | Book/Page | Price | Sale Type | Owner |
|---|---|---|---|---|
| Jul-2006 | 20759/0995 | $1,150,000 | WARRANTY DEED | SEECHARAN RONIK S & |
| Jul-2006 | 20651/0001 | $907,993 | WARRANTY DEED | MOSHAASHAEE MEHDI & |

## Exemptions

**Exemption Information Unavailable.**

## Appraisals

| Tax Year: | 2009 | 2008 | 2007 |
|---|---|---|---|
| Improvement Value: | $469,051 | $665,867 | $635,822 |
| Land Value: | $136,000 | $160,000 | $186,000 |
| Total Market Value: | $605,051 | $825,867 | $821,822 |

Use Code: **0100 - RESIDENTIAL**

**Property Information**
Number of Units: **1**
*Total Square Feet: **6462**
Acres: **0.2504**
* May indicate living area in residential properties.

All values are as of January 1st each year

## Assessed and Taxable Values

| Tax Year: | 2009 | 2008 | 2007 |
|---|---|---|---|
| Assessed Value: | $605,051 | $825,867 | $821,822 |
| Exemption Amount: | $0 | $0 | $0 |
| Taxable Value: | $605,051 | $825,867 | $821,822 |

**Structure Detail**

## Taxes

| Tax Year: | 2009 | 2008 | 2007 |
|---|---|---|---|
| Ad Valorem: | $11,525 | $14,012 | $13,800 |
| Non Ad Valorem: | $356 | $330 | $285 |
| Total Tax: | $11,881 | $14,342 | $14,085 |

**Tax Calculator**

**Details**

Tax Collector WebSite

NOTE: Lower the top and bottom margins to 0.25 on File->Page Setup menu option in the browser to print the detail on one page.

*Exh "C"*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 10-17001-EPK

Chapter 13

IN RE: :
:
Ronik Seecharan and :
Maribel Seecharan, :
:
         Debtors. :
:

## ORDER GRANTING  AMS SERVICING, LLC'S
## MOTION FOR RELIEF FROM STAY
### RE: 11094 Stonewood Forest Trail, Boynton Beach, Florida   33473

This cause came on for consideration pursuant to the Motion By AMS

SERVICING, LLC For Relief From Stay Or In The Alternative, Motion To Dismiss And

Request For Expedited Hearing Re: 11094 Stonewood Forest Trail, Boynton Beach,

Florida 33473 (Doc #_____) filed by AMS SERVICING, LLC ("AMS"), a secured

creditor in the above-styled cause. The Court, having considered said Motion finds it

$Exh \ "D"$

appropriate to grant relief under Local Rule 4001-1(C) without further notice or hearing.

Therefore, it is

ORDERED as follows:

1.    The Motion for Relief From Stay filed by AMS is granted.

2.    The automatic stay provided by 11 U.S.C. 362 is modified as to AMS, its

Successors and Assigns. Accordingly, the automatic stay is modified to permit the

Movant to commence and prosecute a mortgage foreclosure action in state court against

real property, the legal description of which is described below:

Lot 125, CANYON ISLES – PLAT TWO, according to the Plat thereof, as
recorded in Plat Book 105, at Page 40, of the Public Records of Palm Beach
County, Florida

a/k/a 11094 Stonewood Forest Trail, Boynton Beach, Florida 33473

3.    The ten (14) day period under Bankruptcy Rule 4001(a)(3) shall not be

waived upon relief being granted by the Court.

4.    This Order is entered for the sole purpose of allowing AMS, its Successors

and/or Assigns, to commence, prosecute and complete through judgment, sale, certificate

of title and possession, a mortgage foreclosure against the property described above.

AMS, its Successors and/or Assigns, shall not seek or obtain an *in personam* judgment

against the Debtor.

###

Submitted by

Lawrence M. Weisberg, Esquire
FLORIDA BAR NO. 962198
21301 Powerline Road, Suite 100
Boca Raton, Florida 33433

2

561-362-7355 (Telephone)
800-531-8906 (Facsimile)
bankruptcy@lmwlegal.com

The Movant is directed to serve copies of this order on the parties listed and file a certificate of service with the Court.

Maribel Seecharan
11094 Stonewood Forest Trail
Boynton Beach, FL 33473

Ronik Seecharan
11094 Stonewood Forest Trail
Boynton Beach, FL 33473

Jeffrey A. Harrington, Esquire
224 Datura Street, #510
West Palm Beach, FL 33401

Brett A. Elam, Esquire
127 N.E. 2nd Avenue
Delray Beach, FL 33444

Maurice Hinton, Esquire
6111 Broken Sound Parkway, N.W., #200
Boca Raton, FL 33487

Gavin N. Stewart, Esquire
9119 Corporate Lake Drive, #300
Tampa, FL 33634

Office of the U.S. Trustee
51 S.W. 1st Avenue, Suite 1204
Miami, FL 33130

Robin R. Weiner
P. O. Box 559007
Fort Lauderdale, FL 33355

AMS SERVICING, LLC

Lawrence M. Weisberg, Esquire
21301 Powerline Road
Suite 100
Boca Raton, FL 33433

3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 10-17001-EPK

Chapter 13

IN RE:                                   :
                                         :
Ronik Seecharan and                      :
Maribel Seecharan,                       :
                                         :
                  Debtors.               :
_____ :

## ORDER GRANTING AMS SERVICING, LLC'S
## MOTION TO DISMISS

This cause came on for consideration pursuant to the Motion By AMS

SERVICING, LLC For Relief From Stay Or In The Alternative, Motion To Dismiss And

Request For Expedited Hearing Re: 11094 Stonewood Forest Trail, Boynton Beach,

Florida  33473  (Doc #_____) filed by AMS SERVICING, LLC ("AMS"), a secured

creditor in the above-styled cause.  The Court, having considered said Motion finds it

appropriate to grant dismissal without further notice or hearing.  Therefore, it is

ORDERED as follows:

1.      The Motion to Dismiss filed by AMS is granted.

2.      Pursuant to Schedule D of the bankruptcy petition, the Debtors have

exceeded the unsecured and secured debt limits pursuant to 11 U.S.C. 109(e).


###


Submitted by

Lawrence M. Weisberg, Esquire
FLORIDA BAR NO. 962198
21301 Powerline Road, Suite 100
Boca Raton, Florida 33433
561-362-7355 (Telephone)
800-531-8906 (Facsimile)
bankruptcy@lmwlegal.com

The Movant is directed to serve copies of this order on the parties listed and file a
certificate of service with the Court.

Maribel Seecharan
11094 Stonewood Forest Trail
Boynton Beach, FL   33473

Ronik Seecharan
11094 Stonewood Forest Trail
Boynton Beach, FL   33473

Jeffrey A. Harrington, Esquire
224 Datura Street, #510
West Palm Beach, FL   33401

Brett A. Elam, Esquire
127 N.E. 2nd Avenue
Delray Beach, FL   33444


Maurice Hinton, Esquire
6111 Broken Sound Parkway, N.W., #200
Boca Raton, FL 33487

2

Gavin N. Stewart, Esquire
9119 Corporate Lake Drive, #300
Tampa, FL   33634

Office of the U.S. Trustee
51 S.W. 1st Avenue, Suite 1204
Miami, FL   33130

Robin R. Weiner
P. O. Box 559007
Fort Lauderdale, FL   33355

AMS SERVICING, LLC

Lawrence M. Weisberg, Esquire
21301 Powerline Road
Suite 100
Boca Raton, FL   33433

4

1 **WRITTEN DECISION - FOR PUBLICATION**

2

3 ENTERED _____

FILED

4

5 MAY 27 2009

6 CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

7 BY                          DEPUTY

8 UNITED STATES BANKRUPTCY COURT

9 SOUTHERN DISTRICT OF CALIFORNIA

10

11 In re                         )    Case No. 09-00653-A13
                                )
12 LARRY GROH and SHULAMIT       )    ORDER ON TRUSTEE'S
   HANOVER,                      )    OBJECTION TO PLAN AND
13                               )    MOTION TO DISMISS
                    Debtors.     )
14 _____)

15     The Chapter 13 trustee, and the debtors, have taken opposite

16 sides of a question which in prior years was largely irrelevant

17 in this part of the country.  Specifically, the Chapter 13

18 trustee objects to confirmation of the debtors' plan and seeks

19 dismissal of the case on the ground that debtors are not eligible

20 for relief under Chapter 13 because their unsecured debt exceeds

21 the limit set forth in Bankruptcy Code § 109(e).  The trustee

22 includes in his calculation the claims of debtors' secured

23 creditors to the extent their claims exceed the value of debtors'

24 property - that is, the extent to which the claims are

25 undersecured.  The Court holds that this approach is correct in

26 this case and therefore grants the trustee's motion to dismiss.

$Exh$ "$E$".



1       This Court has subject matter jurisdiction pursuant to
2 28 U.S.C. § 1334 and General Order No. 312-D of the United States
3 District Court for the Southern District of California.  This is
4 a core proceeding under 28 U.S.C. § 157(b)(2)(A),(L) & (O).

5                    **BACKGROUND**

6       On January 23, 2009, Larry Groh and Shulamit Hanover
7 (Debtors) filed a petition under Chapter 13 commencing this
8 bankruptcy case.  In their Schedule A Debtors listed their
9 residence with a current value of $459,500.00 (Residence).  In
10 Schedule D Debtors indicated that the Residence was subject to a
11 first priority deed of trust securing a claim of $520,000 and a
12 second priority deed of trust securing a claim of $130,000.
13 Debtors' Schedule F showed general unsecured claims of
14 $177,173.00.

15      The Chapter 13 trustee (Trustee) challenges the Debtors'
16 eligibility to be Chapter 13 debtors on the ground that their
17 unsecured debt exceeds the limit of $336,900 set forth in
18 11 U.S.C. §109(e).  The Trustee includes in his calculation the
19 undersecured portion of Debtors' secured debts and a potential
20 priority tax debt.  A hearing was held on the Trustee's objection
21 to confirmation of Debtors' plan and motion to dismiss.  The
22 Court allowed the parties to submit supplemental briefs and took
23 the matter under submission.  Thereafter, the Court invited
24 additional briefing on two questions.

25 ///

26 ///

-2-

1                              **DISCUSSION**

2          Section 109(e) provides:

3          Only an individual with regular income that owes, on
           the date of the filing of the petition, noncontingent,
4          liquidated, unsecured debts of less than $336,900...
           may be a debtor under chapter 13 of this title.
5

6  The central issue before the Court is whether a claim scheduled

7  as secured by property of the estate, but which, based upon

8  Debtors' schedules, is undersecured or wholly unsecured, is to be

9  included as "unsecured debts" under § 109(e).

10         As noted above, Debtors' schedules show unsecured

11 nonpriority debt of $177,173.00. If this were all the unsecured

12 debt, they would be eligible under § 109(e). However, Debtors'

13 schedules also show that the "unsecured portion" of the claim

14 secured by the first priority deed of trust is $60,500 and that

15 the entire amount of the debt secured by the second priority deed

16 of trust, $130,000, is "unsecured." If this undersecured debt is

17 included, the Debtors' total unsecured debt is $367,673, which

18 exceeds the $336,900 limit of § 109(e), and Debtors would clearly

19 be ineligible.

20         The Court raised the issue and sought supplemental briefs

21 because it recognized that in the current economic environment

22 many debtors whose residences had decreased in value potentially

23 would find themselves ineligible for chapter 13 relief. That

24 unfortunate situation appears, however, to be exactly where we

25 are.

26 ///

-3-

1      In In re Scovis, 249 F.3d 975, 982 (9th Cir.2001) the Ninth

2  Circuit held that, absent an indication of bad faith, Chapter 13

3  eligibility should normally be determined by reference to a

4  debtor's originally filed schedules:

5              We now simply and explicitly state the rule for
          determining Chapter 13 eligibility under § 109(e) to be
6          that eligibility should normally be determined by the
          debtor's original schedules, checking only to see if
7          the schedules were made in good faith.

8  249 F.3d at 982.  In the case at hand, there is no suggestion

9  that Debtors' schedules were not made in good faith.

10  Accordingly, the analysis begins and ends with a review of

11  Debtors' schedules.

12      In Scovis, the Ninth Circuit went on to hold that the

13  unsecured portion of a judgment creditor's undersecured judgment

14  lien on the debtor's residence is to be counted as unsecured debt

15  under § 109(e) for chapter 13 eligibility purposes.  Id. at 983.

16      Debtors appear to attempt to distinguish Scovis on the

17  ground that the secured claim in that case was based upon an

18  abstract of judgment, as opposed to a consensual lien.  However,

19  the Court finds nothing in the Scovis opinion to suggest that it

20  would not apply equally to an undersecured consensual lien.

21  Further, the Court can come up with no rationale for treating the

22  two differently for the purposes of § 109(e).  Certainly, the

23  non-consensual lien is subject to avoidance under § 522(f) where

24  a consensual lien is not.  However, as discussed below, the court

25  in Scovis included the claim both because it was undersecured and

26  ///

-4-

1  because it was subject to avoidance under separate analysis.  The

2  latter is not applicable in this case, but the former is.

3      Debtors also argue that the first priority secured claim

4  cannot be bifurcated into a secured and unsecured claim at this

5  stage.  However, in Scovis, the Ninth Circuit held that the

6  undersecured portion of the judgment creditor's claim was to be

7  "counted as unsecured for eligibility purposes," though no actual

8  bifurcation under § 506 had yet occurred.  249 F.3d at 983.  The

9  court in Scovis followed what it deemed the majority view:

10         [A] vast majority of courts, and all circuit courts
           that have considered the issue, have held that the
11         unsecured portion of undersecured debt is counted as
           unsecured for § 109(e) eligibility purposes.
12

13  Id.  The court went on to hold that the remainder of the judgment

14  lien, which was avoidable under § 522(f) as it impaired debtor's

15  homestead exemption, would be counted under § 109(e) even though

16  no avoidance action had even been commenced:

17         Even though the lien was not judicially avoided until
           after the Chapter 13 petition was filed, the fact that
18         Debtors listed both the homestead exemption and the
           lien on the schedules provides the bankruptcy court
19         with a sufficient degree of certainty to regard the
           judgment lien as unsecured for eligibility purposes.
20

21  Id. at 984.  In the case at hand, § 522(f) does not come in to

22  play.  Nevertheless, the Ninth Circuit's holding further

23  illustrates the rule that the determination under § 109(e) is to

24  be made based solely upon a debtor's schedules, though the

25  procedure to bifurcate or avoid has yet to occur.

26  ///

-5-

1      Thus, based upon Debtors' schedules, $60,500.00 of the debt
2   secured by the first priority deed of trust is to be counted as
3   unsecured debt, as is the entire $130,000.00 which would
4   otherwise be secured by the second priority deed of trust.  This
5   total, when added to Debtors' nonpriority unsecured claims of
6   $177,173.00, is sufficient to exceed the $336,500.00 figure and
7   render Debtors ineligible.

8      Debtors' schedules also include unsecured priority debt of
9   $35,000.00 in favor of the Internal Revenue Service and the
10  Employment Development Department for "non-dischargeable employer
11  taxes."  Though the claims were not scheduled as contingent,
12  unliquidated or disputed, the Debtors have since argued that they
13  should not be included under § 109(e) because they are
14  "contingent" claims which are actually liabilities of their
15  wholly owned corporation, Landscapers Technical Services, Inc.,
16  and that no individual liability has been assessed.  It appears
17  likely that Debtors have responsible person liability for these
18  claims and that since the corporation, now closed, has no ability
19  to pay, they will be called upon to pay.  However, in light of
20  the inclusion of the undersecured claims in the § 109(e)
21  calculation the Court need not resolve this issue.

22      As noted, the Court invited additional briefing on two
23  questions.  One involved the potential priority tax debt which,
24  as stated above, need not be resolved in this case.  The second
25  question asked whether the first position note and trust deed was
26  a purchase money obligation or refinance.  If it was a purchase

-6-

1  money obligation, the follow-up question was whether the anti-
2  deficiency legislation in California making the debt nonrecourse
3  meant any deficiency should not be counted as a liability of the
4  debtors for purposes of calculating their debt limits under
5  § 109(e).  The debtors, through their counsel, have advised that
6  both the first and second position notes and trust deeds were the
7  result of refinancings, not purchase money transactions.

8       Many states have adopted anti-deficiency legislation over
9  the years, intending to protect consumers from deficiencies
10  arising from foreclosure on their principal residences.  If such
11  a deficiency were nonrecourse as to the Debtors, then the
12  question was whether such a nonrecourse claim should be counted
13  in calculating the Debtors' eligibility under § 109(e).  The
14  court invited additional briefing because of the importance of
15  the issue and because the parties had not previously addressed
16  it.  In its invitation, the court cited the parties to two cases
17  which appeared to answer the question: <u>Johnson v. Home State</u>
18  <u>Bank</u>, 501 U.S. 78 (1991) and <u>In the Matter of Lindsey, Stephenson</u>
19  <u>& Lindsey</u>, 995 F.2d 626 (5th Cir. 1993).

20       <u>Johnson</u> involved a Chapter 13 case filed after the debtor
21  had discharged his personal liability on the debt secured by real
22  property in Chapter 7.  The bank's lien against the collateral
23  remained after discharge, and the debtor proposed to pay it
24  through a Chapter 13 plan.  The issue addressed by the Supreme
25  Court was whether the bank's mortgage interest after the Chapter
26  7 discharge was a "claim" amenable "to inclusion in a Chapter 13

-7-